**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:11cr97**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **MEMORANDUM OF DECISION** |
| Vs. ) | |
| ) | |
| ELIEZER PONCE-DUARTE, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**THIS MATTER** is before the court upon defendant's Motion to Suppress (#16). Having carefully considered defendant's Motion to Suppress, reviewed the pleadings, and conducted an evidentiary hearing, the court enters the following findings, conclusions, and Order denying the Motion to Suppress.

**FINDINGS AND CONCLUSIONS**

**I.     Background**

Defendant is charged in a one-count Bill of Indictment with possession of a firearm by an illegal alien in violation of 18 U.S.C. § 922(g)(5). This charge arises from a "knock and talk" visit to defendant's residence at 7419 Mary Jo Helms Drive, Charlotte, North Carolina, on March 15, 2011.

Defendant has moved to suppress the evidence secured as a result of the search. He contends that the warrantless search violated his protections from unlawful search and seizure as secured under the Fourth Amendment to the United States Constitution. Further,

1

defendant contends that any consent that his house mate may have given was either coerced or non-existent, making all evidence obtained during the search that followed inadmissible as fruit of the poisonous tree.

The government contends that defendant's house mate, Ms. Miranda Guzman (the mother of defendant's four children), gave law enforcement officers knowing and voluntary consent to enter the home and then led the agents to defendant; that defendant later gave agents consent to search the residence for other male occupants and then for guns and drugs; that after executing a written consent to search, defendant led them to where the firearm was found; and after being advised of his Miranda rights, admitted to be unlawfully in the United States.

## II. Evidentiary Hearing

An evidentiary hearing was conducted on July 12, 2011. While the court will discuss the testimony at greater length below, to summarize the two hours of testimony, the government called DEA Special Agents Eric Lee and Jorge Alamillo, who were sequestered during the hearing. Despite being sequestered, each agent testified in a consistent manner as to the events surrounding the entry into and search of defendant's residence. As discussed below, such credible testimony supports a determination that consent was lawfully obtained at each step of the investigation. As a result of the search, the agents discovered a gun in defendant's bedroom and obtained an admission by defendant that he was in the United States illegally, which is probative on the elements of the offense charged.

In rebuttal, defendant called Ms. Guzman who testified that the DEA agents forcefully

entered the residence without a warrant, despite Ms. Guzman refusing consent to their entry. Not only did Ms. Guzman have reason to fabricate her testimony inasmuch as defendant is the father of her four dependent children, the testimony of Ms. Guzman lacked the earmarks of credibility both on direct and cross examination as her testimony was both evasive and internally inconsistent. For example, Ms. Guzman testified on direct that she was still wearing her nightclothes at about 9:15 a.m. on the morning of the search. She testified that her night clothes consisted of a "blouse with little straps" and that she told the agents that she did not want them to come in because she " needed to get dressed." While that testimony standing alone is plausible, she testified on cross examination that she was scheduled to work on the day of the search starting at 9 a.m., that she lived 10 minutes from work, but that she was not working that morning because she had already been to work and was sent home because there was no work for her that day. Ms. Guzman failed, however, to explain why she was still in her night clothes despite having both come to and gone from work that morning. The court also found such testimony concerning modesty inconsistent with her testimony that two unknown men were then residing in the home. Indeed, the bulk of her testimony was fraught with inconsistencies and implausibilities, which included a statement that she secluded herself in her own bedroom once the officers barged in and went upstairs. While she testified that she did not know anything else that occurred after secluding herself in her bedroom, she then testified as to events that occurred later in the search. When questioned about such inconsistency, she then testified that she had been ordered by the agents to come downstairs. Ms. Guzman then testified that, despite being downstairs , she

heard shouting from upstairs and heard the sound of a gun being drawn from a holster from the master bedroom. The court found such testimony to not be least bit credible. The court carefully observed the demeanor of the witness as she answered the questions of counsel and it was apparent to the court that her responses were both evasive and contrived.

In addition to explaining why the court did not fully credit Ms. Guzman's testimony, the court believes it is important to the decision-making process to also explain why it found the testimony of the agents to be credible. The court considers the testimony of all witnesses appearing before it to be of equal worth and value and entitled to the same consideration -- the testimony of law enforcement officers carries with it no presumption of credibility. Here, despite sequestration, the testimony given by the agents was consistent both internally and with each other. Even subject to the skillful cross examination by defense counsel, the agents' answers were non-evasive and where the agents did not recall certain details, they freely admitted that they did not know. In addition to providing credible testimony, the court found particularly persuasive the testimony of Agent Alamillo, who testified that Spanish was his native language, that he had been brought into the investigation for his language skills, and that he had no trouble conversing with either the defendant or Ms. Guzman. Indeed, Ms. Guzman even testified that she had no trouble understanding Agent Alamillo's Spanish. Agent Alamillo's testimony concerning Ms. Guzman's demeanor was particularly important in determining whether consent was freely and voluntarily given.

### III. Standard Applicable to a Motion to Suppress

Motions to suppress are mixed questions of law and fact that are disposed of by the

court without the assistance of the jury. United States v. Stevenson, 396 F.3d 538 (4th Cir. 2005); Fed.R.Crim.P. 12(b)(3)(C), 12(d); Fed.R.Evid. 104(a).

When a defendant moves to suppress evidence seized based on a "knock and talk," the Court of Appeals for the Fourth Circuit has held, as follows:

> ordinarily, no Fourth Amendment violation occurs when the police "knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants." *Rogers v. Pendleton*, 249 F.3d 279, 289 (4th Cir.2001); *see Alvarez v. Montgomery County*, 147 F.3d 354, 357 (4th Cir.1998) ("[P]olice may approach a building, including the front entranceway to a residential dwelling, without committing a search where a person lacks a reasonable expectation of privacy in the area."). Furthermore, the police may circle to the back of the home under appropriate circumstances. *See Alvarez*, 147 F.3d at 358. The police may not, however, conduct a full search of the curtilage without a warrant or another justification that would be sufficient for entry into the home itself. *See Rogers*, 249 F.3d at 287, 289.

Edens v. Kennedy, 2004 WL 1737880, 3 (4th Cir. 2004). Defendant does not appear to challenge the "knock and talk" aspects of the investigation; rather, he appears to contend that the resulting entry and search of his home was not consensual.

Law enforcement may conduct a search of a dwelling without a warrant and without probable cause if the suspect voluntarily consents to the search. United States v. Matlock, 415 U.S. 164, 171 (1974); Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). Where a search is conducted based on consent rather than a warrant, the burden is on the government to show by a preponderance of the evidence that, under the totality of the circumstances, voluntary consent was obtained prior to the search that resulted in discovery of evidence defendant wishes to exclude. Id.

The appropriate inquiry for determining whether consent was voluntary was

discussed by the district court in United States v. Tyson, 360 F.Supp.2d 798 (E.D.Va. 2005), which held as follows:

> In determining whether a defendant's consent was voluntary, the critical inquiry is whether a defendant's consent to search was his own "essentially free and unconstrained choice" or whether his will was "overborne and his capacity for self-determination critically impaired." *United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (*quoting Schneckloth*, 412 U.S. at 219, 93 S.Ct. 2041). This inquiry is based on an examination of the totality of the circumstances. *See Schneckloth*, 412 U.S. at 223-34, 93 S.Ct. 2041; *Boone*, 245 F.3d at 361; *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir.1996). In assessing the totality of the circumstances, appropriate factors to consider include the characteristics of the accused (such as his age, maturity, education, intelligence, and experience) and the conditions under which the consent to search was given (such as the officer's conduct, the number of officers present, and the duration of the encounter). *Lattimore*, 87 F.3d at 650. While it is a relevant factor in the voluntariness inquiry that the defendant knew of his right to refuse consent, the government need not establish that the defendant knew of his right to refuse to prove that consent was voluntary. *Boone*, 245 F.3d at 362; *United States v. Brugal*, 209 F.3d 353, 362 (4th Cir.2000). Additionally, consent given while in custody may still be voluntary so long as the totality of the circumstances confirms that the consent was not coerced. *Boone*, 245 F.3d at 362-63 (*citing Watson*, 423 U.S. at 424, 96 S.Ct. 820).

Id., at 805. While the government has the burden of proving by a preponderance of the evidence that consent is voluntary, United States v. Hummer, 916 F.2d 186, 189 (4th Cir. 1990), "so long as a reasonable person would feel free 'to disregard the police and go about his business' the encounter is consensual and no reasonable suspicion is required." United States v. Farrior, 535 F 210, 218 (4th Cir. 2008) (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)).

## IV. Discussion

In moving to suppress, defendant has presented no evidence in rebuttal that

defendant's consent was coerced. Instead, defendant has focused on Ms. Guzman's consent or lack of consent for the agents to enter the home. Defendant argued that if such entry were unlawful, the resulting search and seizure of evidence was fruit of the poisonous tree even if defendant's later consent was freely and voluntarily obtained. Thus, the court will first consider whether the agents properly obtained consent from Ms. Guzman to enter the home.

A.     **Ms. Guzman's Consent to Entry**

While Ms. Guzman testified in a less than credible manner that she did not consent to entry, the totality of the credible evidence presented indicates that she did in fact knowingly and voluntarily consent to such entry. As a threshold matter, the court determines that Ms. Guzman did consent and will now turn to whether that consent was made freely and voluntarily.

In making such determination, the court has considered the characteristics of the person giving consent, including her age, maturity, education, intelligence, and experience. While she testified that she only received five years of formal education, cross examination revealed that Ms. Guzman left school of her own freewill for economic reasons and not due to any intellectual deficit or difficulty in learning. Indeed, Agent Alamillo testified that, based on Ms. Guzman's use of formal Spanish, he perceived Ms. Guzman as being well educated. The testimony provided by Ms. Guzman lends credence to that conclusion, as Ms. Guzman answered complex and probing questions by counsel. Based on the court's observation of defendant during the hearing, it is clear that, regardless of her educational attainment, she is a very intelligent person. While certain clarifications were asked for by

defendant, it was clear that she was not only able to understand questions being asked, she was able to formulate complex responses.

The court also considered the maturity of Ms. Guzman, who appeared to be a mature person. One clear indicator of maturity is being a responsible parent. She testified that her school age children were in school on the day in question and that in addition to taking care of her children, she consistently worked when work was available. Indeed, the court noted that Ms. Guzman was a very successful parent inasmuch as her very young children were neatly dressed and well behaved in the courtroom despite their lack of direct supervision while Ms. Guzman testified. While it could be argued that providing less than credible testimony is not a characteristic of a mature person, it was clear that such testimony was motivated by concern for the support of her children. The court found her answers to be those of a person functioning at a high intellectual level.

As far as experience, it appeared that Ms. Guzman had traveled to the United States for economic reasons some time ago and had been in the Charlotte area for at least six years. Further, she testified that she had been a parent for 10 years and worked outside the home.

The court also considered the conditions under which the consent to search was given, including the agents' conduct, the number of agents and officers present, and the duration of the encounter. Ms. Guzman testified that she only saw one agent at the door, while the agents testified that two were present. While Agent Alamillo wore his gun on his hip and a police vest, Agent Lee wore plain clothes with his weapon concealed. The supporting agents and officers did not come to the door and thus did not create an

overwhelming or overbearing police presence when the initial consent to enter was sought. The initial encounter was very brief and resulted in the agents being invited into the home with little delay.

Based on the credible testimony, the court finds that the agents conducted themselves in a most professional manner: they asked the little girl who answered the door to speak to a parent; when Ms. Guzman arrived, they advised her of the reason they were there and secured her consent to enter the home; one agent was in street clothes with his weapon concealed, while the other was wearing a "police" vest with his weapon holstered; the officers presented at the home during daylight hours; and the officers communicated no threats or promises. The only credible evidence presented indicated that Ms. Guzman remained calm and was in no manner visibly shaken or upset by the agents' presence or their request. Thus, considering a totality of the circumstances, the court finds that Ms. Guzman freely and voluntarily consented to the officer's entering home.

  **B. Ms. Guzman's Consent to Allow the Agents to Go Upstairs**

After being allowed inside, Agent Alamillo informed Ms. Guzman that they were looking for Hispanic male subjects supposedly at her address. Ms. Guzman, dressed in day clothes, informed the agents that there were male Hispanics upstairs. Agent Alamillo testified that he then asked for permission to go upstairs and that Ms. Guzman led the way. He testified that she was at all times coherent, calm, and cooperative.

She took them to the master bedroom where they found defendant. Defendant was also dressed for the day.

### C. Defendant's Consent to Search for the Other Male Subjects

After finding defendant in the master bedroom, Agent Alamillo then spoke with defendant, who also appeared to such agent to be well educated. After encountering defendant, defendant informed the agents that there were two other males in another bedroom upstairs, and gave permission to search for such men. Agent Lee found the men in one of the two other upstairs bedrooms. During that portion of the search, defendant and Ms. Guzman waited in the living room downstairs with other agents. After discovering the two Hispanic males, the agents as well as the subjects joined the others in the living room.

### D. Defendant's Consent to Search for the Gun and Drugs

Once Agent Lee determined that defendant was the renter of the home, he asked defendant to join him in the kitchen with Agent Alamillo, which he did without objection. While in the kitchen, Agent Alamillo asked defendant whether there were any weapons in the home, and defendant responded that there was a weapon in the master bedroom. The agents testified that defendant's demeanor remained cordial, cooperative, and not confused.

Once defendant revealed that there was a gun in the home and the agents had disclosed the nature of their investigation, the agents asked for written permission to search the home. Agent Lee testified that defendant appeared ready, willing, and able to consent. They presented defendant with a DEA Form 88, which is a written consent to search form in Spanish, which was read to defendant. (Government's Ex. 1). The agents witnessed defendant sign such form and then asked him to show them exactly where the gun was, which defendant pointed out as being in a dresser located in the master bedroom.

After locating the gun, the agents and defendant came back downstairs, at which point Agent Alamillo read defendant Miranda warnings in Spanish from a DEA issued card. After waiving his rights, Agent Lee testified that defendant admitted that he was not legally in the country and had been previously turned away from entry at the border. At that point, defendant was placed under arrest for unlawful possession of a firearm by an illegal alien.

E.    **Conclusion**

In this case, the scope of the search was well with the bounds of objective reasonableness as the agents secured consent at each step of the investigation and were careful not to exceed the bounds of the consent then given. United States v. Coleman, 588 F.3d 816, 819 (4th Cir. 2009). Based on a totality of the circumstances surrounding the securing of such consents, the court finds that the credible evidence presented indicates that neither Ms. Guzman's nor defendant's freewill had been overcome by any conduct attributable to either Agent Lee or Agent Alamillo. Instead, the court finds based on the totality of the circumstances, Schneckloth v. Bustamonte, supra, that Ms. Guzman and defendant voluntarily consented to the entry and search of the residence located at 7419 Mary Jo Helms Drive on March 15, 2011.

**ORDER**

**IT IS, THEREFORE, ORDERED** that defendant's Motion to Suppress (#16) is **DENIED** for the reasons discussed above.

Signed: July 14, 2011

Max O. Cogburn Jr.
United States District Judge